# Saylor *v.* Chartiers Coal and Coke Company, Appellant.

*Negligence—Mines and mining—Bituminous mines—Mine foreman—
Ventilation—Failure to provide material—Question for jury.*

In an action against a coal mining company to recover damages for the
death of plaintiff's husband, a miner, caused by an explosion of gas in a
bituminous coal mine, the case is for the jury and a verdict and judgment
for plaintiff will be sustained, where the evidence shows that the accident
was due to the failure of the mine foreman to close up "cut throughs"
that first became useless, and then dangerous, as the work progressed; that
at the time of the explosion there was absolutely no material on hand, as
required by law, to enable the foreman or anyone else to keep the ventilat-
ing apparatus in a condition necessary for the safety of the miner; and that
such material had been asked for by the foreman and promised by the
superintendent more than three weeks before, but was not furnished until
the day after the explosion.

Argued April 9, 1906. Appeal, No. 250, April T., 1905, by defendant, from judgment of C. P. No. 3, Allegheny Co., Nov. T., 1903, No. 116, on verdict for plaintiff in case of Elizabeth Saylor v. Chartiers Coal and Coke Company. Before RICE, P. J., PORTER, HENDERSON, MORRISON, HEAD and BEAVER, JJ. Affirmed.

Trespass to recover damages for death of plaintiff's husband. Before KENNEDY, P. J.

The facts are stated in the opinion of the Superior Court.

Verdict and judgment for plaintiff for $1,000. Defendant appealed.

*Error assigned* was refusal of binding instructions for defendant.

*M. J. Hosack*, with him *Geo. M. Hosack, Roger Knox*, and *John D. Evans*, for appellant.—Prior to any recovery on the part of the plaintiff, the burden of proof was upon her to prove (1) negligence; (2) defendant's negligence, and (3) that the negligence of the defendant was the proximate and direct cause of the injury complained of: Johnston v. Youghiogheny River Coal Co., 183 Pa. 623; Pittston Coal Co. v. McNulty, 120 Pa. 414; Ford v. Anderson, 139 Pa. 261; Moules v. Canal Co., 141 Pa. 632.

It is seen that if there was any failure to supply lumber for the purpose of bratticing, which failure is not at all proved on the part of the plaintiff, that the negligence was due to the mine foreman, and he being a fellow servant with the plaintiff's intestate would bar any right of action upon the part of said plaintiff: Mansfield Coal and Coke Co. v. McEnery, 91 Pa. 185; Hall v. Simpson, 203 Pa. 146; Commonwealth v. Reynolds, 1 Kulp, 218; Redstone Coke Co. v. Roby, 115 Pa. 364.

*R. P. Marshall*, for appellee, filed no printed brief.

OPINION BY HEAD, J., October 5, 1906 :

The learned counsel who argues for the appellant, in his printed brief fairly states the single question to be considered in this case in the following language : " The assignments of

error in this case raise practically but one question : Was negligence of the defendant company sufficiently proved by the plaintiff in the trial of this case to warrant the court in submitting the evidence to the jury ? "

The business of mining coal in Pennsylvania has grown to such enormous proportions, it directly affects the lives of so many citizens and the prosperity. and happiness of their families, that our legislature has wisely determined to regulate and control many features incident to it by positive, statutory enactments.   When, therefore, an action has been begun against a coal operator, alleging that the injury complained of was the result of negligence in relation to some matter covered by legislative regulation, a careful examination of the statute ought to enable us to determine, without serious difficulty, whether or not there has been any failure to obey the mandates of the law, and if there has been, where the responsibility therefor should properly rest.

The amended statement, in the present case, alleges that Jacob Saylor, the husband of the plaintiff, who was employed as a coal miner in the bituminous mine of the defendant, " was killed by reason of an explosion of gas in the aforesaid mine.   The death of said Jacob Saylor was caused by reason of the negligence and carelessness of the said defendant in not properly ventilating said mine, and in failing to provide the mine foreman with proper material with which to keep the mine in such a condition that it might be properly ventilated, whereby gas accumulated in the same."

Whilst it may be fairly inferred from the testimony that this mine belonged to the class in which gas was not regularly produced in dangerous quantities, and, as a consequence, the men were permitted to work with open lights, yet our lawmakers have not been unmindful of the well-known fact that, in every bituminous mine, there is a constant possibility that small pockets of gas may be liberated at the face of the workings, which, if permitted to accumulate, would soon become dangerous.   The means prescribed by law to obviate this danger is the system of ventilation which has for its *object* the keeping of a powerful current of pure air continuously moving past the working places.   This current, thus constantly moving, would have a tendency to dissipate and carry away all such small

quantities of gas as might be liberated, and thus prevent their dangerous accumulation.

The system of ventilation in use at this mine, as is shown by the testimony and illustrated by the blue print attached to the appellant's brief, was simple, but, if properly maintained, would have doubtless been an adequate compliance with the provisions of the law on that subject. In brief, it consisted of two parallel entries, a short distance apart, each proceeding from an independent surface opening to the face of the coal. One of these entries was called the main or face entry, the other the air passage. At or near the face they were connected by a " cut through " the coal from one to the other. A powerful suction fan was located at the surface opening of the air passage, which, when in operation, would draw to it all the air in that passage and thus have a tendency to create a vacuum. The fresh air entering the main entry at its surface opening and traveling along it would naturally rush through the " cut through " to fill the vacuum in the air passage, and thus the required current at the face would be produced. As, in an operating mine, the working places are being constantly pushed forward along the main or face entry, it is manifest that, to keep the current up with the moving miner, new " cut throughs " must be made, and as each new one is made the old one must be closed or " bratticed," in order that the new one may become effective.

The responsibility for the constant maintenance of this all-essential air current is imposed, by the law itself, in part upon the operator and in part on the mine foreman, an official whose duties, qualifications, etc., are prescribed by the act of assembly. Each of these persons has his own duties to perform, and each is responsible for any failure in that respect.

It has often been held that the mine foreman is an official over whose performance of his own duties the employer has no control, and for whose neglect he is not liable : Hall v. Simpson, 203 Pa. 146 ; Redstone Coke Co. v. Roby, 115 Pa. 364. If, therefore, the negligence alleged in the present case consisted in a failure to make " cut throughs " at the proper places, or to close or brattice the old ones so as to carry the air current past them, the necessary material therefor having been provided, or to operate the fan, or to make a daily exami-

nation of the working places, etc., the performance of all which duties is cast, by law, on the mine foreman, the case of the plaintiff could not stand. But it could hardly be contended that it was the duty of the mine foreman to provide the fan or the machinery to run it, or to furnish the material necessary for either the construction or maintenance of any part of the ventilating apparatus. Section 1 of article IV of the act of 1893, P. L. 52, provides : " The operator or superintendent of every bituminous coal mine . . . . shall provide and hereafter maintain ample means of ventilation for the circulation of air through the main entries, cross entries and all other working places, to an extent that will dilute. carry off and render harmless the noxious or dangerous gases generated in the mine." Section 1 of article VII provides : " It shall be the duty of the superintendent, on behalf and at the expense of the operator, to keep on hand at the mines at all times a full supply of all materials and supplies required to preserve the health and safety of the employees, as ordered by the mine foreman and required by this act." We cannot escape the conclusion that the failure of the operator to do what he is thus expressly enjoined to do by the law, would be an act of negligence for which he would be responsible, and it is precisely such an act of negligence that is declared on in the statement already quoted from. Was there sufficient evidence of a failure on the part of the operator " to provide and maintain ample means of ventilation," or " to keep on hand at all times a full supply of all materials and supplies required, as ordered by the mine foreman," to warrant the court in submitting that question to the jury?

Charles McDonald, a man of many years' experience in mining coal, who was in the vicinity of the mine at the time of the explosion and entered the mine with a party almost immediately thereafter, testified as follows (App., page 50) : " We closed up two break-throughs before we got to the Mikus entry, and then closed up the Mikus entry. We closed them up to carry the ventilation and fresh air to the face of the main entry. Q. Did you close up any after you passed the Mikus entry? A. Yes, sir. Q. How many? A. Two; and the third one we left open to let. the air return to the return airway. Q. The last one ought to be left open? A. Yes, sir."

On page 51: "Q. How long before this accident had you been up this face entry? A. About twenty days, or maybe twenty-one. Q. Had these break-throughs ever been closed up—the ones you closed after the explosion? A. There was no indication of it. Q. Could you have seen it if there had been? A. Yes, sir. Q. No trouble about seeing that? A. No, sir." On page 52: "Q. You say these three had never been closed? A. No, never had been closed; if they had, there would have been indications of it." Having testified on page 50 that he had sent to the store of the Pittsburg Coal Company to get brattice cloth to close up the "cut throughs" after the explosion, the witness on page 54 goes on: "Q. What did you do at this mine, if anything, before you sent to the Pittsburg Coal Company for this canvas? A. Called for material, and the fire boss came and we started to put up a brattice and found one board sixteen feet wide. That was all the material on hand." Finally, on page 55, that he had heard the mine foreman, as early as the second or third of May, ask the superintendent for material, good heavy, strong lumber, for use in the mine to put the brattice in, and that the material was promised, but never arrived until the day after the explosion, which was May 26 or May 27.

Without going further into the evidence we have here testimony, plain, positive and emphatic, tending to show that, at the time of the accident, there was and could have been no such current of air at the face of the coal as is contemplated by the law, because of the failure of the mine foreman to brattice and close up the "cut throughs," that first became useless and then dangerous, as the work progressed. That at the time of the explosion there was absolutely no material on hand, as required by law, to enable the foreman, or anyone else, to keep the ventilating apparatus in the condition so necessary for the safety of the miner. That such material had been asked for by the foreman and promised by the superintendent more than three weeks before, but was not furnished until the day after the explosion. If the witness was credible the jury could find from such testimony that there was a lamentable failure on the part of the company to obey, in an all-important matter, the express commands of the legislature. That such a failure would be an act of negligence we

cannot doubt.   We must conclude, therefore, that the learned trial court could do nothing else than submit the case to the jury, and the assignments of error, which attack only the fact of such submission, cannot be sustained.

Judgment affirmed.